# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

United States of America,                          Case No. 24-CR-00009 (ECT/JFD)

             Plaintiff,

v.                                                 **REPORT AND RECOMMENDATION**

Rubin David Adams,

             Defendant.

---

This case is before the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1 for a report and recommendation on two dispositive pretrial motions filed by Defendant Rubin David Adams: a Motion to Suppress Eyewitness Identification (Dkt. No. 34) and a Motion to Suppress Evidence Obtained by Search and Seizure (Dkt. No. 35), both dated June 19, 2024. Mr. Adams is charged with Armed Robbery of a Mail Carrier, in violation of 18 U.S.C. § 2114(a); Theft of Postal Service Keys, in violation of 18 U.S.C. § 1704; and Mail Theft, in violation of 18 U.S.C. § 1708.

The Court held a motions hearing on July 12, 2024. Assistant United States Attorney Emily Polachek represented the United States. Attorney Arthur Waldon, IV represented Mr. Adams. The United States called U.S. Postal Inspection Service Inspector Brent Brandner ("Inspector Brandner") to testify. (Hr'g Tr. 12:3, Dkt. No. 41.) The United States also introduced six exhibits: the audio recording of Inspector Brandner's photographic lineup with a victim-witness identified by the intitals "Z.S.," (U.S. Ex. 1) the document

containing the photographs and instructions shown to Z.S. at the lineup, (U.S. Ex. 2) the audio recording of Inspector Brandner's photographic lineup with victim-witness "T.G.," (U.S. Ex. 3) the document containing the photographs and instructions shown to T.G. at the lineup, (U.S. Ex. 4) the signed application for a search warrant seeking Facebook account data attributed to Rubin Adams and Roc Adams, (U.S. Ex. 5) and a signed search warrant for an apartment on Graham Avenue (along with another residence and vehicles not at issue here) (U.S. Ex. 6). After the hearing, Mr. Adams and the United States filed supplemental briefs, (Dkt. Nos. 43, 46, respectively) and the Court took the motions to suppress under advisement on September 6, 2024, the date of the last filing. For the reasons set forth below, the Court now recommends that both motions be denied.

## I.    Background

Mr. Adams is charged with two counts of Armed Robbery of a Mail Carrier, and one count each of Theft of Postal Service Keys and Mail Theft in relation to two robberies of United States Postal Service ("USPS") postal carriers on November 18 and 19 of 2023, one in Edina, MN and the other in Brooklyn Center, MN. (Gov.'s Post-Hr'g Resp. to Pretrial Mot. 1, Dkt. No. 46.) In both alleged robberies, a man held a postal carrier at gunpoint and demanded the postal carrier hand over his "mailbox key."[1] (*Id.*) In Edina, the postal carrier, Z.S., did not have his arrow key at the time and instead provided the man with the keys to USPS vehicles. (*Id.* at 2.) In Brooklyn Center, the postal carrier, T.G.,

---

[1] According to the United States, the keys in question are known as "arrow keys" and they are a type of universal key that opens USPS mail collection boxes and other secure mail storage containers in a given geographic area.

complied and surrendered his arrow keys. (*Id.*) Soon after, the United States Postal Inspection Service ("USPIS") received multiple reports of checks being stolen from mail collection boxes in Brooklyn Park. (*Id.*)

### A. Preliminary Stages of Investigation and Facebook Warrant

Shortly after the Brooklyn Park robbery, police identified the vehicle used in that robbery, resulting in a chase and subsequent crash. (*Id.*) Those in the vehicle fled, and police found in it the keys stolen in the Edina robbery, a counterfeit driver's license, and the identification for a person named Roc Adams. (*Id.* at 3.) Police reviewed the public-facing information on Roc Adams's Facebook profile, from which they learned that he had a brother in the area, Rubin Adams, the Defendant in this case. (*Id.*) In viewing Rubin Adams's publicly available Facebook profile, police identified advertisements for fake identification documents and posts that investigators recognized as involved in perpetrating counterfeit check schemes. (*Id.*) This publicly available information formed the basis for a search warrant for the data associated with both Adamses' Facebook accounts. (U.S. Ex. 5.) The information obtained through that search warrant provided additional evidence of posts that investigators determined were part of counterfeit check-cashing schemes. (Gov.'s Post-Hr'g Resp. to Pretrial Mot. 3, Dkt. No. 46).

On November 20, 2023, USPIS Postal Inspector Matt Hoffman performed a photographic lineup with both Z.S. and T.G. to try to identify the person who allegedly robbed them. (*Id.*) A photograph of Mr. Adams did not appear in that lineup. (*Id.*) In that lineup, Z.S. identified one of the photographs as the man who robbed him with 70%

confidence, and T.G. did not identify any of the photographs as the alleged perpetrator. (*Id.*)

### B. USPIS Investigation and Eyewitness Identification

Part of the USPIS's investigations of the alleged robbery and stolen mail was for a United States Postal Inspector—in this case, Inspector Brent Brandner—to perform an additional photographic lineup with each postal carrier. (*Id*. at 3–4.) On December 5, Inspector Brandner completed the photographic lineup with both Z.S. and T.G. independently, showing each carrier the lineup without interference of third parties. (*Id*.) The photographs in this lineup were all of different men than were in the November lineup and included Mr. Adams. (U.S. Ex. 2, 4.) Each of the six photographs portray a Black man of similar age from the chest up, with a dark-colored beard and dark hair styled in dreadlocks. (*Id*.) Each man is depicted wearing a maroon t-shirt underneath a looser-fitting bright orange shirt or coveralls. (*Id*.) In the background of each picture is a neutral, light-colored wall. (*Id*.)

In the December 5 lineup, Z.S. identified Mr. Adams as the man who robbed him with 90% confidence. (Def.'s Mot. Suppress. Eyewitness Identification 3, Dkt. No. 34.) T.G. identified a different photograph as the perpetrator with 50% confidence. (*Id*.) Inspector Brander testified that he played no role in creating the lineup (i.e., selecting the photographs that would be used in the lineup) and that he had no knowledge of which photograph depicted the person of interest (i.e., Mr. Adams) or his identity. (Hr'g. Tr., 14:18–22, Dkt. No. 41.)

### C. Warrant and Search of the Graham Avenue Apartment

4

On December 28, 2023, investigators learned that Mr. Adams, who had been identified by Z.S. in the photograph lineup, had been wearing a GPS ankle monitor as a condition of pretrial release for charges in Georgia, and location data from that monitor placed Mr. Adams in the vicinity of both alleged robberies and the mail receptacles from which mail had been stolen. (Gov.'s Post-Hr'g Resp. to Pretrial Mot. 4, Dkt. No. 46.) Once this information was collected, USPIS Inspector Matthew Hoffman applied for and received a search warrant for an apartment on Graham Avenue in Saint Paul, Minnesota, which was leased to Arterria Lipsey, a person associated with Mr. Adams, and which was believed to be Mr. Adams's residence. (*Id*.)

The application identified the crimes charged in this case, along with other offenses under investigation including Robbery of mail, money, or other property of the United States; Conspiracy; Forgery of Postal Service Money Orders; Identity Fraud; Aggravated Identity Theft; Wire Fraud; and Bank Fraud. (U.S. Ex. 6.) It also detailed the investigation process to that point, including the information gleaned from Facebook accounts controlled by Mr. Adams, Roc Adams, and Arterria Lipsey. (*Id*.) Public posts to these accounts often tagged each other and referenced similar criminal check-cashing activities, showing Inspector Hoffman that there was a connection between the three individuals. (*Id*.) After identifying Ms. Lipsey as potentially involved in the offenses, Inspector Hoffman obtained St. Paul Police and apartment leasing records that indicated that she lived in the Graham Avenue apartment. (*Id*.) He and other investigators also personally observed vehicles associated with the robberies of the postal carriers in the parking facilities attached to the

apartment building. (*Id*.) It was upon this information that Inspector Hoffman applied for and received a search warrant for the apartment.

## II. The Court recommends that Mr. Adams's Motion to Suppress Eyewitness Identification be denied.

Mr. Adams moves to suppress Z.S. and T.G.'s photographic lineup identification of Mr. Adams as the armed man who approached them while they completed their postal routes. He argues that the identifications by Z.S. and T.G. were both impermissibly suggestive and unreliable. (Def.'s Mot. Suppress Eyewitness Identification 1, Dkt. No. 34.)

### A. The photographic lineup identification of Mr. Adams by Z.S. and T.G. was not impermissibly suggestive.

Mr. Adams argues that the procedure used by the USPIS in presenting the photographic lineup to Z.S. and T.G. was impermissibly suggestive because it made it more likely that the alleged victims would identify him as the perpetrator. He supports this argument by saying that in the six-photograph lineup, presented independently to the two postal carriers, "[t]he negative space around Mr. Adams'[s] head and shoulders is significantly less than is present in the other photographs, giving the appearance that the photographer zoomed in on Mr. Adams, but not the other individuals." (*Id*. at 10.) Mr. Adams argues that the effect of this difference is akin to if Mr. Adams's photograph would have been the only in the array depicting the subject with a particular item of clothing. (*Id*.)

An eyewitness identification is impermissibly suggestive if "the police have arranged suggestive circumstances leading the witness to identify a particular person as the perpetrator of a crime." *Perry v. New Hampshire*, 565 U.S. 228, 232 (2012). But even when a photographic identification has been "infected by improper police influence, … [it] is not

6

automatically excluded" unless there is a "very substantial likelihood of irreparable misidentification." *Id*. (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)). If the "indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth." *Id*. This is a low bar to admission, which is easily cleared by the procedures by which the photographic identifications in this case were made.

The Court finds Mr. Adams's arguments regarding his depiction in the photographic lineup unavailing. The depictions of the photographs' subjects are nearly identical, and the minute differences between them are merely the result of the photographs being taken of different men at different times. While there are variances between the photographs, there is no common characteristic among the five other photographs not shared by the photograph of Mr. Adams such that the photograph of Mr. Adams is immediately more notable. (U.S. Ex. 2, 4.) Certainly, the differences between Mr. Adams's photograph and the others do not rise to the level of "effectively isolat[ing]" Mr. Adams's picture, as he claims. (Def.'s Mot. Suppress Eyewitness Identification 10, Dkt. No. 34.)

Mr. Adams also argues that the fact that Z.S. identified another man in the November 20 lineup as the man who robbed him with 70% certainty makes his identification of Mr. Adams in the December 5 even more impermissibly suggestive and unreliable. (*Id*.) He argues that "[i]t is the likelihood of misidentification which violates a defendant's right to due process." *Neil v. Biggers*, 409 U.S. 188, 198 (1972). The Court agrees that this is the standard for assessing the constitutionality of a photographical

eyewitness identification, but Mr. Adams's appeal to logic falls short. Mr. Adams says that by subjecting Z.S. to a second lineup less than three weeks after his first lineup implied to Z.S. that his initial identification was incorrect, which made the December 5 lineup suggestive. (Def.'s Mot. Suppress Eyewitness Identification 10, Dkt. No. 34.) The Court would be willing to further entertain this argument if a photograph of Mr. Adams appeared in the November 20 lineup, but one did not. (Gov.'s Post-Hr'g Resp. to Pretrial Mot. 3, Dkt. No. 46.) Even if the short turnaround between the two lineups would imply that Z.S. had initially indicated the "wrong" person, there is no logical connection between Z.S. choosing the "wrong" person in the first lineup and him choosing Mr. Adams in the second lineup, which had photographs of six entirely different men than the first.

Ultimately, the Court can find no improper behavior by the law enforcement agents as to Z.S.'s and T.G.'s eyewitness identifications of Mr. Adams through the photographic arrays presented by the USPIS, but even if there were improper procedures, those procedures do not rise to the level of creating a "very substantial likelihood of irreparable misidentification," such that they should be excluded from jury consideration. *Perry v. New Hampshire*, 565 U.S. 228, 232 (2012) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)). The reliability and weight to assign to each witness's identification of Mr. Adams's photograph in the lineup is a question for the jury to decide, not the Court, and any potential factors the jury should consider regarding eyewitness identification can easily be addressed in a jury instruction at trial. *Perry*, 565 U.S. at 248.

### III.    Motion to Suppress Evidence Obtained by Search of Mr. Adams's Facebook Account

Mr. Adams moves to suppress the evidence obtained through the retrieval of information from Meta Platforms, Inc. via search warrant regarding a Facebook account the United States alleges is owned and controlled by him on the grounds that the warrant was overly broad and lacked sufficient particularity. (Def.'s Mot. Suppress Ev. by Search & Seizure 1, Dkt. No. 35.)

A. *There was probable cause to issue the search warrant for the data associated with Mr. Adams's Facebook account.*

First, Mr. Adams argues that the search warrant application of Detective Vesey, the Brooklyn Center police officer who applied for the Meta warrant, lacked probable cause because "the Facebook warrant application contained mere conclusory statements regarding Mr. Adams' alleged involvement in the November 19 & 22, 2023, robberies." (Def.'s Post-Hr'g Mem. Supp. Pretrial Mot. 3, Dkt. No. 46.) He says that the United States never alleged in the warrant application that he was present at the robberies, and the only evidence in the application as to his involvement were "alleged Facebook posts by Mr. Adams regarding fake drivers' licenses." (*Id*.) This is an inaccurate representation of the contents of the warrant application, and even if it were accurate, the posts about the drivers' licenses were enough on their own to support a finding of probable cause by the Hennepin County judge.

The Fourth Amendment provides that:

[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend IV. Whether probable cause for the issuance of a search warrant exists "depends on whether, under the totality of the circumstances, there is a fair probability evidence of a crime will be found in a particular place." *United States v. Faulkner*, 826 F.3d 1139, 1144 (8th Cir. 2016) (citing *United States v. Rodriguez*, 711 F.3d 928, 936 (8th Cir. 2013)). When one court reviews another court's probable cause determinations, the reviewing court "pay[s] 'great deference' to the probable cause determinations of the issuing judge or magistrate, and our inquiry is limited to discerning whether the issuing judge had a substantial basis for concluding that probable cause existed." *United States v. Lucca*, 377 F.3d 927, 933 (8th Cir. 2004) (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)).

Under this standard, it is difficult to find even a colorable argument that the issuing judge erred by issuing the warrant for Mr. Adams's Facebook account data. Mr. Adams claims that Detective Vesey did not sufficiently allege that he took part in the robberies of the postal carriers. He is correct that the warrant application does not contain an affirmative allegation that Mr. Adams committed the robberies, but he is incorrect in arguing that such an allegation was required to establish probable cause. Law enforcement was investigating several different but related crimes, and Detective Vesey did say there was public-facing evidence that Mr. Adams was involved in a check counterfeiting operation, as well as a business selling fake identification documents, one of which was used in Mr. Adams's brother's purchase of the Chrysler 300 used in connection with the robberies. (U.S. Ex. 5.) This is sufficient for the issuing judge to have found that there was "a fair probability [that] evidence of *a* crime," *Faulkner*, 826 F.3d at 1144 (emphasis added), would be found in the

10

larger corpus of data associated with Mr. Adams's Facebook account that was not already publicly available.[2] By showing, as he did, that some evidence of *any* of the crimes under investigation could be found in the Facebook data, Detective Vesey demonstrated that his search warrant application was supported by probable cause. The warrant application's claims regarding the publicly available Facebook posts that resembled solicitations to engage in social media-based check fraud and the sale of fake identifications are sufficient to show that evidence of those crimes may be found in the data requested.

B. *The search warrant possessed the particularity required under the Constitution.*

Mr. Adams then argues that the warrant for the accounts "effectively placed no limits on the items to be searched" because it essentially includes all the data associated with Mr. Adams's Facebook account. (Def.'s Post-Hr'g Mem. Supp. Pretrial Mot. 3, Dkt. No. 46.) The warrant authorizes  law enforcement to seize a broad range of types of data including all personal identifying data; all activity logs for October 5, 2023 to November 29, 2023; all photos and videos posted by or tagging the account between those dates; all other profile information; all location and IP address data; all messaging data between October 5 and November 29; all liked pages and posts; all friend lists; all searches made from October 5 to November 29; and all privacy settings. (U.S. Ex. 5 at 12.)

---

[2] Even as to the postal robberies, Detective Vesey did not have to allege that Mr. Adams himself was involved in the robberies. The warrant application was sufficient as to the postal robberies so long as it showed that some evidence related to those robberies could be found in the Facebook account data. There is no requirement that such evidence be specifically evidence of Mr. Adams' personal involvement in the robberies.

The substantive scope of this data is very large, but the temporal scope is limited to just under two months, October 5, 2023 to November 29, 2023. (*Id.*) A search warrant that authorizes the seizure of a large amount of data, even of large amounts of data spread across different data types, is not *per se* unconstitutional, so long as each item specified in the warrant is supported by probable cause that the item will be found in the place to be searched and that the item is evidence of a crime or contraband. Having reviewed the warrant, the Court finds that probable cause supports the seizure of each item specified. In addition, the warrant is limited temporally to the time around when the robberies and specific acts of fraud and theft at issue in this case occurred. The Court finds the search warrant appropriately limited as required by the Constitution.

C.   *The* <u>Leon</u> *good-faith exception prevents suppression.*

Even if the warrant were issued without a substantial basis to believe that probable cause exists or even if the warrant were constitutionally overbroad, the evidence obtained under those search warrants will not be suppressed if law enforcement relied in good faith on the findings of the issuing judge. In *Leon v. United States*, the Supreme Court held that the exclusionary rule does not apply when the police obtain evidence by acting on "objectively reasonable reliance" on a search warrant. 468 U.S. 897, 922 (1984); *see also Herring v. United States*, 555 U.S. 135, 142 (2009) (quoting *Leon*, 468 U.S. at 922). The purpose of the exclusionary rule is to deter police misconduct, and where the police have relied on the probable cause determination of a neutral and disinterested judge, there is no police misconduct, and thus, nothing to deter through application of the exclusionary rule. *Herring*, 555 U.S. at 142; *Leon*, 468 U.S. at 916. "Once the warrant issues, there is literally

nothing more the policeman can do in seeking to comply with the law. Imposing an admittedly indirect 'sanction' on the police officer in that instance is nothing less than sophisticated nonsense." *Stone v. Powell*, 428 U.S. 465, 498 (1976) (Burger, C.J., concurring)

The *Leon* "good faith" exception will not apply for the following four reasons, even though law enforcement applied to a court for a search warrant, which the court issued:

> (1) the supporting affidavit or testimony includes a false statement made knowingly and intentionally or with reckless disregard for the truth to mislead the issuing judge; (2) the issuing judge wholly abandoned his judicial role in issuing the warrant; (3) the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or (4) the warrant is so facially deficient that no police officer could reasonably presume the warrant to be valid.

*United States v. Ortiz-Cervantes*, 868 F.3d 695, 702–03 (8th Cir. 2017) (citing *United States v. Proell*, 485 F.3d 427, 431 (8th Cir. 2007)). None of these scenarios exist here. Detective Vesey who applied for the warrant did not make a false statement in his affidavit, and Mr. Adams does not assert that he did. There has been no allegation that the issuing judge acted improperly in any way. As discussed above, there is far more than an indicium of probable cause supporting the warrant, so reliance on the warrant by the executing officers was reasonable. And the warrant has no facial deficiencies.

Finally, the Court notes that determining what the allegedly poisonous fruits of the Facebook data tree are in this case are very difficult. Mr. Adams provides very few, if any, concrete examples of evidence derived from the search that will likely be used against him at trial. Further, the United States claims that there was very little information that was recovered in the data from Meta that investigators didn't already know from the publicly

available posts on Mr. Adams's account, which were accessible without a warrant. (Gov.'s

Post-Hr'g Resp. to Pretrial Mot. 3, Dkt. No. 46.)

### IV. Motion to Suppress Evidence Obtained by Search of the Graham Avenue Apartment

Mr. Adams moves to suppress the evidence obtained through the search of the

Graham Avenue apartment leased to Ms. Lipsey on the grounds that it improperly granted

officers discretion to determine which items to seize and therefore, was overly broad and

lacked sufficient particularity to definitively identify the property to be seized. (Def.'s Post-

Hr'g Mem. Supp. Pretrial Mot. 7, Dkt. No. 46.) Among the items to be seized were:

1. Articles of personal property evidencing the identity of the person(s) occupying … the [apartment];
2. All records indicating the owner's state of mind as it relates to the crimes under investigation;
3. Any U.S. Mail addressed to any entity;
4. Any keys issued or used by the U.S. Postal Service;
5. Any U.S. Postal Service property;
6. Any handguns or other firearms;
7. Any articles of clothing related to the crimes under investigation;
8. U.S. Currency and foreign currency;
9. Checks bearing the names or addresses of persons not residing at the location searched;
10. Checks, money orders, or other negotiable instruments;
11. Receipts reflecting the purchase of assets or merchandise;
12. Notes, records, correspondence, photographs, or other items establishing the identities of potential victims or members of the conspiracy;
13. Notes, records, correspondence, photographs, or other items related to the transfer of funds from one individual to another;
14. Communication between individuals, including but not limited to written notes or correspondence, chat room logs, private messages, text messages, or e-mail messages relating to the production, transfer or use of identification documents, authentication features, access devices, false identifications or a means of identification, creation of counterfeit checks, or purchase, sale, transfer, management, or other disposition of assets;

15. Any and all passwords and other data security devices, either in hardcopy or electronic format, designed to restrict access to or hide computer user accounts, software, documentation, or data;

16. Computers or other computer peripherals, such as printers, scanners, digital cameras, laminators, stamps, or signature capture devices, capable of being used to produce counterfeit identification shipping labels, postage, documents, checks, or other access devices;

17. Any software that may be used to create personal or business checks (e.g., Versacheck), computers on which such software is installed, data files created by check creation software, and any papers or inks used in the printing of checks;

18. Any digital device capable of storing information related to the commission or attempted commission of the above listed violations, or used to facilitate the above listed violations; and,

19. Any authentication features, document-making implements, identification documents, false identification documents, false identification features, means of identification, counterfeit access devices, unauthorized access devices, and device-making equipment, including but not limited to, passports, drivers licenses, Social Security cards and numbers, credit cards, birth certificates, checks and checking account information, credit card numbers, debit card numbers, bank account numbers and information, automated teller machine card personal identification numbers, or any other evidence pertaining to the unlawful possession, transfer, or use of a means of identifications of another or counterfeit identification documents.

(U.S. Ex. 6.) Of these categories, Mr. Adams specifically takes issue with the warrant's inclusion of "records indicating the owner's state of mind" relating to the offenses, "articles of clothing related to the crimes," and items "establishing the identities of potential victims or members of the conspiracy" as providing too much discretion to law enforcement personnel executing the warrant. (Def.'s Post-Hr'g Mem. Supp. Pretrial Mot. 7–8, Dkt. No. 46.)

Other than a general statement of law that "because the warrant left the items to be seized at the discretion of law enforcement, all evidence obtained from the Graham Avenue warrant must be suppressed," (*Id.* at 8) (citing *Andresen v. Maryland*, 427 U.S. 463, 480

(1976)), Mr. Adams cites no legal authority supporting his claim that the warrant's language constitutes an overly broad, unconstitutional warrant. Mr. Adams also identifies no specific piece of his property that was seized in the search of the Graham Avenue apartment that he claims was seized unconstitutionally and therefore should be excluded.

The United States argues that the warrant for the Graham Avenue apartment was sufficiently particular, and in doing so it points to other items on the list above, which do state specific items to be seized. On the item allowing searching officers to seize records indicating "the owner's state of mind," the United States identifies several cases in this District where the same or similar language has been found to be constitutionally adequate because such evidence is often required to prove a defendant's *mens rea* in committing a crime. (*See* Gov.'s Post-Hr'g Resp. to Pretrial Mot. 12, Dkt. No. 46.).

Mr. Adams cites *Andresen v. Maryland* as support for his argument that all fruits of a warrant that gives any discretion at all to police officers conducting a search must be suppressed, but that is not what that case says. In *Andresen*, the Court held that "[g]eneral warrants of course, are prohibited by the Fourth Amendment" to protect citizens from "a general, exploratory rummaging in a person's belongings." *Andresen* 27 U.S. at 480 (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)). However, in *Andresen*, the Court specifically found the search in question constitutional, even though the warrant directed the seizure of evidence relating to an enumerated crime at an enumerated place. *Andresen* 27 U.S. at 480–81. Here too, the warrant sought evidence relating to the robberies alleged to have occurred in late November 2023 and the fraud and theft offenses relating to the broader check cashing scheme alleged to be the motivating force behind the robberies. All

of the evidence that the USPIS sought in its warrant application was directly connected to either the robberies or the check cashing operation alleged.

As to Mr. Adams's contention that the warrant's authorization of a search of "notes, records, correspondence, photographs, or other items establishing the identities of potential victims or members of the conspiracy," the United States argues that the authorization was necessarily broad to allow for a search for information regarding potential other defendants. (*See* Gov.'s Post-Hr'g Resp. to Pretrial Mot. 13, Dkt. No. 46.) The United States asserts that the affidavit "provide[s] reasonable guidance to the exercise of informed discretion," (*Id*.) (quoting *United States v. LeBron*, 729 F.2d 533, 536 (8th Cir. 1984)) such that the warrant allowed the executing officers to collect evidence on potential other defendants while sufficiently cabining their discretion to include only those items that were relevant to the check cashing and fraud enterprise alleged. (*Id*.) Ultimately, the United States claims that there is "a clear nexus" between the offenses and the items to be seized in the warrant, such that the warrant is not so broad as to allow the police to conduct an "exploratory rummaging" of Mr. Adams's belongings. (*Id*.) (quoting *LeBron*, 729 F.2d at 536.)

The Court agrees. There was sufficient support in the warrant application to guide the executing officers in exercising a limited discretion in deciding what property to seize in searching the Graham Avenue apartment, and the categories listed all substantially relate to an offense under investigation when the warrant was granted. Finally, as with the Facebook warrant discussed above, the Court agrees with the United States' assertion that even if the warrant were over broad, there are no obvious deficiencies in the warrant that would render it facially unconstitutional. As such, the Court finds that *Leon* good faith

applies to this warrant. The Court recommends that Mr. Adams's motion to suppress evidence seized during the search of the Graham Avenue apartment be denied.

## V.    RECOMMENDATION

Accordingly, based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant Rubin David Adams's Motion to Suppress Eyewitness Identification Dated May 1, 2024 (Dkt. No. 34) be **DENIED**; and

2. Defendant Rubin David Adams's Motion to Suppress Evidence Obtained from Search and Seizure (Dkt. No. 35) be **DENIED**.

Date: October 4, 2024                              *s/ John F. Docherty*
                                                    JOHN F. DOCHERTY
                                                    United States Magistrate Judge

### NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under LR 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).