UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 24-9 (ECT/JFD)

UNITED STATES OF AMERICA,

      Plaintiff,

v.                         **GOVERNMENT'S POSITION REGARDING SENTENCING**

RUBIN DAVID ADAMS,

      Defendant.

Rubin David Adams, after amassing nine felony convictions and while on probation, illegally possessed a firearm, committed—along with his accomplice—two armed robberies of mail carriers, defrauded bank customers of almost $60,000, and used a fake identity to purchase a car. The layers of Adams's brazen criminal conduct paint a portrait of an individual who is far too comfortable with his criminality; someone whose punishment is necessary to for the protection of the public. By sticking a gun into the faces of United States Postal Service employees, Adams instilled a destabilizing fear of death or grave injury. And all for the triteness of money. Adams's repeated criminal conduct necessitates a lengthy and appropriate period of imprisonment and supervision. Accordingly, the United States recommends the Court sentence him to 130 months' imprisonment, followed four years of supervised release. Considering the relevant sentencing factors set forth in 18 U.S.C. § 3553(a), such a sentence is sufficient, but not greater than necessary.

## I. Offense Conduct.

The offense conduct is adequately described in the PSR (¶¶ 5-10).

## II. Sentencing Guidelines Range.

On December 17, 2024, Adams pleaded guilty to Count 1 (Aiding and Abetting Armed Robbery of a Mail Carrier) and Count 2 (Armed Robbery of a Mail Carrier) of the Indictment. As consideration for Adams's guilty plea, the Government agreed to move to dismiss the remaining count of the Indictment at sentencing, as well as cabined itself to a sentencing recommendation between 120-137 months' imprisonment. The PSR's Guidelines range calculation differs from what the parties anticipated. The base offense level for Adams's crimes is 20. PSR ¶¶ 18, 25. Based on the specific characteristics of Adams's criminal conduct, the PSR recommends (1) a two-level increase because USPS property was taken and was an object of the offense; PSR ¶¶ 19, 26; and (2) a five-level increase because a firearm was brandished during the commission of the offense. PSR ¶¶ 20, 27. The grouping rules dictate a two-level upward adjustment. PSR ¶ 34. Adams admitted criminal culpability and, as such, the Government concurs in a three-level downward adjustment to reflect such acceptance. PSR ¶ 37-38. The parties anticipated that Adam's criminal history category would be V. *See e.g.,* PSR ¶ 2. Properly calculated, Adams's criminal history category is VI. The Government does not object.

Should the Court agree with the PSR's calculations, Adams's advisory Guidelines range is 120-150 months' imprisonment.[1]

### III. The Appropriate Sentence.

The Guidelines range is the start, and not the end, of the analysis. *See e.g., United States v. Ruvalcava-Perez*, 561 F.3d 883, 886 (8th Cir. 2009) ("In sentencing a defendant, the district court should first determine the appropriate Guidelines range, then evaluate whether a traditional departure is warranted, and finally decide whether or not to impose a guideline sentence after considering all the § 3553(a) sentencing factors"). The Government has considered the applicable 3553(a) sentencing factors and provides the following as reasons for the Court to adopt the recommendations herein.

First, the nature and circumstances of these layered offenses are serious. Adams and his accomplice pointed guns at U.S. mail carriers to steal the arrow or master keys for mailbox receptacles. Not only were both victims working, wholly innocent, and likely extremely terrified, but Adams's crime left them both scarred, acknowledging the fragility of life by taking much needed time off from work—and sacrificing their wages—after the ordeal. Ultimately, no one was injured, but Adams and his accomplice's willingness to brandish guns in furtherance of their crime indicates the firearms likely weren't just for show.

---

[1] The Government's recommendation is between either range, despite the difference between the anticipated and resulting Guidelines range as calculated by U.S. Probation.

3

Unfortunately, we live in a society where violence like Adams and his accomplice wreaked here is the norm. Our District and local communities have been immersed in it for years now. The reasons for the precipitous rise and maintained normalcy are, of course, multifactorial; the Government does not lay all that has happened at Adams's feet. But to be clear, Adams's actions contributed to our District's gun violence issues. The current backdrop and context cannot be ignored. Firearms are in a unique position to instantly and tragically shatter lives. Each projectile has the ability to injure, maim, or kill. Often, innocent bystanders, like the victims in this case, find themselves targeted. These actions have lasting impacts on households, families, and communities. Sometimes for generations.

Standing alone, this Court should not tolerate Adams's crimes here. Given the District's struggles with gun violence, the protection of the community against those who illegally possess and use firearms and target members of our community with gun violence creates a renewed urgency to appropriately punish engaged in such criminality. A sentence of 130 months' imprisonment creates the possibility of specifically deterring Adams from resorting to the similar habits when he is released from custody. Such a sentence also sends a message to the public that reflects the seriousness of the offense, promotes respect for the law, and a stand against the continued illegal possession of firearms and violence that such possession causes.

Particularly aggravating to Adams's crimes are his targets. First, the United States Postal Service "is the only delivery service that reaches every address in the nation: Nearly 167 million residences, businesses and Post Office Boxes."[2] Since 1775, and starting with Benjamin Franklin as our Nation's first Postmaster General, USPS has connected our populace. Millions of birthday, sympathy, get-well-soon, congratulatory, and holiday greeting cards, letters to and from loved ones, gifts and commercial items, are entrusted for delivery every day by postal employees. Though the world has changed dramatically since 1775, and with the emergence of competitors like UPS and FedEx, the rubric is the same; millions of people around the world trust USPS for their delivery needs. The fact that an individual in Anchorage, Alaska, can affix a small, sliver of adhesive paper to an envelope for delivery to a quaint address in Bangor, Maine is a remarkable marvel of which the collective American public often takes for granted. In committing crimes against USPS and its employees, Adams attacked the connectivity that has bound us for centuries. But he is not the first to do so.

The United States Government Accountability Office (GAO) analyzed the crime patterns from fiscal years 2017 through 2023 towards postal

---

[2] *About the United States Postal Service,* *http://about.usps.com/who/profile*, last accessed May 12, 2025.

workers.[3] The analysis noted that the theft of arrow keys in robberies—as in this case—had increased from 10 percent 2017 to 51 percent in 2023, with approximately 600 robberies reported in 2023. *Id.* Letter carriers describe themselves as "sitting ducks," as robberies have continued to trouble USPS workforce.[4] A sentence of 130 months acknowledges the nature and extent of Adams's crimes, while sending a message to others who target mail carriers that severe penalties will be imposed.

In addition to Adams's robbery violations, the Court must consider his fraudulent criminal conduct as well. After stealing the arrow keys, Adams used the same to obtain approximately $60,000 from various banks and victims. Further, Adams used another's identity to finance a car loan to purchase Chrysler 300. These continued crimes illustrate that a 130-month sentence is appropriate here. While the Government acknowledges such a sentence would far exceed any sentence Adams has ever served, a look at his criminal history provides adequate justification.

---

[3] *Crimes against letter carriers*, Christopher Jackson, The Postal Record, Sept./Oct. issue, https://www.nalc.org/news/the-postal-record/2024/september-october-2024/document/DCD.pdf

[4] *See e.g., Letter carrier robberies continue as the US Postal Service, union and lawmakers seek solutions*, https://apnews.com/article/usps-mail-theft-carriers-robbed-39193536815bbb6e4b4bc02ac0b6b4f1, AP News, Mar. 12, 2024, last accessed May 12, 2025.

Adams's criminal history details that this criminal episode is not his first with firearms. First, in 2018, Adams fired multiple rounds in a parking lot. PSR ¶ 53. Adams fled from police but was later found with the firearm which had an obliterated serial number. *Id.* Five months later, Adams was involved in a first-degree aggravated robbery where he was shot. PSR ¶ 54. More recently, in 2021, Adams was pulled over in Georgia and found with a loaded pistol. PSR ¶ 58. Ultimately, no one—but Adams—was injured in these cases. However, Adams's continued proximity to firearms, and marked escalation in this case, is of clear concern.

Equally concerning is that Adams's crimes occurred while was on probation. PSR ¶ 61. Supervision has seemingly never deterred him, having violated several times in the past. *See e.g.,* PSR ¶¶ 53, 54, 58. It is clear from his repeated conduct that a significant sentence is warranted to protect the public from Adams's recidivism and that a substantial graduated sentence, given the conduct, is appropriate here.

Tempering the Government's recommendation are Adams's history and characteristics, which provide mitigation for the Court to consider. *See e.g.,* PSR ¶¶ 73 (foster care), 74 (parental substance abuse issues), 80 (witness to extreme violence). While Adams's issues and struggles do not, and cannot, exculpate or excuse his criminal behavior, they help to provide context for his actions and have been considered by the Government in its recommendation.

7

Should the Court sentence Adams to a term of imprisonment, the Government recommends the Court utilize supervised release as a tool to decrease Adams's chances of recidivism and to bolster his opportunities for success. Supervised release "is a unique method of post-confinement supervision," *Gozlon-Peretz v. United States*, 498 U.S. 395, 407 (1991), that "fulfills rehabilitative ends, distinct from those served by incarceration." *United States v. Johnson*, 529 U.S. 53, 59 (2000). It "is not punishment in lieu of incarceration." *United States v. Granderson*, 511 U.S. 39, 50 (1994). Rather, "congressional policy in providing for a term of supervised release after incarceration is to improve the odds of a successful transition from the prison to liberty," *Johnson v. United States*, 529 U.S. 694, 708-09 (2000).

To the point, Adams's egregious criminal conduct, as well as his prior, poor record on supervision, speak towards a need for an appropriate supervised release period. The need for a smooth transition from prison to society is paramount to further protect the community and for Adams's rehabilitation. The Government's recommendation of four years' supervised release provides an adequate amount of time for such a transition, and the structured environment provided by U.S. Probation has the ability to decrease Adams's chances of recidivism. In the absence of any lasting behavioral changes, supervision can adequately inform the Court and potentially provide further public protection. As conditions for supervised release, the Government is

supportive of conditions outlined in the PSR. PSR ¶¶ 129-135. In addition, the Government is supportive of Re-Entry Court, should Adams qualify. Lastly, the Government is supportive of any other condition the Court deems appropriate.

With regard to restitution, the Government is in receipt of multiple claims. While Adams agreed to a significant amount of restitution in this case already, the Government recently received new restitution documents and will confer with Adams's counsel prior to sentencing regarding a final, agreed upon amount.[5] At sentencing, the Government will request the Court order the defendant pay restitution in total amount of $78,323.26.

## CONCLUSION

All told, 130 months' imprisonment, followed by four years' supervised release adequately accounts Adams's criminal conduct. Lastly, such a sentence accomplishes federal sentencing goals and is sufficient, but not greater than necessary.

Dated: May 12, 2025                                Respectfully Submitted,

                                                   LISA D. KIRKPATRICK
                                                   Acting United States Attorney

                                                   */s/ Evan B. Gilead*
                                                   BY: EVAN B. GILEAD
                                                   Assistant United States Attorney

---

[5] The parties will provide the Court will a final itemized restitution spreadsheet and/or stipulation at sentencing.